# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

**AIDA R. GIL**
*(Plaintiff)*

v.

**605 WEST 42ND OWNER LLC, THE MOINIAN GROUP, JOSEPH MOINIAN, ALEX SMALJAJ, COURTNEY LEES, JULIO DEL ORBE, KIMBERLY CAFARO, MARIO FENKO and JUAN MITRE/DIAL-A-BUG**
*(Defendants)*

**Civil Action No.: __1:25-cv-05396-MKV__**

**COMPLAINT FOR VIOLATION OF FAIR HOUSING ACT, REHABILITATION ACT, CONSPIRACY, UNAUTHORIZED TRANSMISSION, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

---

Plaintiff Aida R. Gil ("Pplaintiff") appearing pro se, files this Amended complain pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), which permits amendment within 21 days after service of a responsive pleading or action. Defendants have not yet filed any responsive pleading or motion to the original complaint served on October 31, 2025. This Amended Complaint supersedes and replaces the original Complaint in its entirety.

## PARTIES

1. Plaintiff Aida R. Gil is a resident of New York County, New York, and a qualified individual with a disability under the Fair Housing Act ("FHA") and Americans with Disabilities Act ("ADA").
2. Defendant 605 West 42nd Owner LLC is the owner and operator of the residential building located at 605 West 42nd Street, New York, New York, 10036, where Plaintiff resides.
3. Defendant The Moinian Group is the parent company and manager of 605 West 42nd Owner LLC.
4. Defendant Joseph Moinian is founder and CEO of The Moinian Group and is named in HPD violation reports as responsible for building compliance.
5. Defendant Alex Smaljaj is a residential manager employed by Defendants who participated in unauthorized photography of Plaintiff's apartment and coordination with HPD to subvert court-ordered inspections.
6. Defendant Courtney Lees is a Senior Property Manager who signed Plaintiff's lease agreements that omitted required disability and safety notices.
7. Defendant Julio Del Orbe is a senior residential manager who submitted false affidavits to courts regarding remediation compliance.
8. Defendant Kimberly Cafaro is Executive Vice President, Residential Management, Operations & Leasing, named in HPD violation reports as responsible for building compliance.

9. Defendant Mario Fenko is Regional Operations Supervisor named in HPD violation reports as responsible for building compliance.
10. Defendant Juan Mitre, the Pest Remediation Specialist from the Dial-A-Bug company hired by 605 West 42nd ST LLC.

---

# JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, as this action arises under federal civil rights statutes including the Fair Housing Act (42 U.S.C. § 3601 et seq.) and Rehabilitation Act (29 U.S.C. § 794).
12. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.
13. Venue is proper in this district because the events giving rise to this claim occurred in New York County and Defendants conduct business in this district.

---

# FACTUAL ALLEGATIONS

## Plaintiff's Disability Status and Development

14. Plaintiff moved into her apartment at 605 West 42nd Street in November 2018 without any documented respiratory conditions or disabilities.
15. Over several years of exposure to poor air quality, pest infestations, inadequate ventilation, and other habitability issues that Defendants systematically refused to remediate, Plaintiff began experiencing respiratory symptoms.
16. In December 2023, Plaintiff was medically diagnosed with Asthmatic Allergic Rhinitis after years of exposure to conditions in her apartment that Defendants had failed to address despite repeated requests. Breathing is a major life activity. (Exhibit A – *Medical Records*)
17. At the time of diagnosis, Plaintiff's allergist noted that Plaintiff had the lung capacity of a 70-year-old, although Plaintiff was 38 years old, indicating significant respiratory deterioration.
18. Plaintiff was prescribed Trelegy Ellipta, a combination medication used to manage severe long-term breathing conditions such as asthma or COPD.
19. Plaintiff was also diagnosed as allergic to mice after prolonged exposure to pest infestations that Defendants refused to properly remediate.
20. In February 2025, when Defendants finally cleaned a severely contaminated bathroom vent that had been neglected for years, the majority of Plaintiff's breathing problems dissipated, demonstrating the connection between apartment conditions and her respiratory deterioration. (Exhibit B – *Disability Disclosure*)
21. Following this improvement, Plaintiff's asthma medication was changed from Trelegy (for severe asthma) to Symbicort (for moderate asthma), reflecting the improvement in her condition after partial remediation.
22. However, in March 2025, a pulmonologist confirmed that Plaintiff now has permanent asthma, independent of allergies, showing how conditions that may have been temporary in 2023 became permanent due to prolonged exposure to unremediated habitability issues.

23. In February 2025, Plaintiff was also diagnosed with Eustachian Tube Dysfunction (ETD) linked to Allergic Rhinitis. ETD impairs auditory processing and hearing is a major life activity. (See Exhibit A – *Medical Records*)
24. In addition to being an administrative professional, plaintiff is a professional singer, voice-over artist, and performing artist whose career/income depends on optimal respiratory function and hearing acuity. The respiratory and auditory conditions that developed due to Defendants' systematic negligence have directly impacted Plaintiff's professional capabilities and earning capacity in her chosen field.
25. Defendants' systematic negligence in maintaining habitable conditions contributed to the onset and progression of Plaintiff's disabilities, transforming what may have initially been temporary allergy responses into permanent respiratory and auditory conditions requiring lifelong medical management.
26. Plaintiff is a qualified individual with a disability under the Fair Housing Act and Rehabilitation Act.

## Federal Funding and Housing Program Context

27. The subject property receives federal financial assistance through the U.S. Department of Housing and Urban Development (HUD) Section 8 Housing Choice Voucher program, as Defendants accept Section 8 tenants in the building. Additionally, upon information and belief, the building participates in New York City's 80/20 program and receives substantial tax benefits under the 421-a program, both of which involve federal oversight and funding mechanisms. (Exhibit F – *Community Board Letters*)

## HPD's Pattern of Favoritism Toward Defendants

28. Upon information and belief, HPD has demonstrated a pattern of making procedural concessions and departures from standard practice in favor of Defendants.
29. A community board letter documented that HPD failed to properly advertise affordable housing units in Defendants' building, raising concerns about the integrity of the affordable housing lottery process.
30. Plaintiff won her apartment through this lottery, raising questions about whether HPD's favorable treatment of Defendants extended to manipulating tenant selection to favor applicants who might be less likely to assert their rights.
31. On or about February 17, 2025, HPD cancelled or failed to conduct a court-ordered inspection after Defendant Smaljaj and HPD Inspector Courtney Posley conducted an impromptu, coordinated inspection on February 12, 2025. (Exhibit D – *HPD Inspector Records*)
32. HPD systematically accepted Defendants' false certifications without conducting required re-inspections, contrary to HPD's own stated policies and procedures.
33. On June 17, 2025, Plaintiff filed an Article 78 proceeding against HPD in New York Supreme Court, Index No. 100618/2025, Gil v. NYC Dept. of Housing Preservation & Development, before Hon. David B. Cohen, challenging HPD's acceptance of Defendants' false certifications without required re-inspections and HPD's interference with court-ordered inspections. (Exhibit G – *Article 78 Proceeding*)
34. This pattern of favoritism demonstrates that Defendants have cultivated relationships with government officials that allow them to circumvent normal regulatory oversight, making civil damages the only available remedy to protect tenant rights.

## Pattern of Discrimination and Denial of Reasonable Accommodations

35. On January 30, 2025, Plaintiff emailed Defendants citing habitability issues, including a mouse infestation, and explicitly stating: "As I am allergic to mice, I have been experiencing respiratory issues, which may be aggravated by [the mice's] presence," thereby providing clear notice of her disability and need for accommodation. (See Exhibit B, *Email from January 30, 2025*)
36. On February 9, 2025, Plaintiff sent another email stating, "Along with the mold in my bathroom, this mice infestation poses serious health risks for me, as I suffer from allergic rhinitis and asthma and am allergic to mice," further emphasizing her disability-related needs. (See Exhibit B, *Email from February 9, 2025*)
37. Despite repeated requests for reasonable accommodations in the form of proper pest remediation and air quality improvements, Defendants systematically refused to provide adequate accommodations for Plaintiff's documented disabilities.

## Coordinated Obstruction of Court-Ordered Remediation

38. On February 12, 2025, Defendant Alex Smaljaj coordinated with an HPD inspector to conduct an unauthorized inspection of Plaintiff's apartment, in violation of court orders and HPD procedures.
39. This impromptu inspection was designed to circumvent the February 17, 2025 court-ordered inspection and prevent proper documentation of habitability violations.
40. On March 5, 2025, Defendants entered into a court-ordered stipulation requiring remediation on March 12-13, 2025, but systematically failed to comply despite Plaintiff's full cooperation.
41. On April 24, 2025, Plaintiff was hospitalized due to an allergic reaction caused by exposure to mouse feces that Defendants had failed to remediate despite multiple court orders. (See Exhibit A, *Medical Record dated April 24, 2025*)

## False Affidavits and Regulatory Fraud

42. On May 13, 2025, Defendant Julio Del Orbe submitted a false affidavit to Housing Court containing multiple perjurious statements, including (Exhibit H – *Julio del Orbe Affidavit from May 13, 2025*):
    - "I am familiar with Ms. Gil and have been inside the apartment" (he had only met Plaintiff once in February 2025)
    - "[Landlord] has cured the violation by sending an exterminator...on three occasions" (knowing this did not constitute proper remediation)
    - "Both the technician and Building agents have observed no access point...for mice" (no such comprehensive inspection occurred)
43. Defendants knew these statements were materially false when made, as proper Integrated Pest Management had not been performed and violations remained outstanding.
44. Defendants submitted false self-certifications to HPD claiming required remediation work had been completed when it had not been performed, enabling improper closure of violation complaints on July 29, 2025.
45. As a direct result of Defendants' false certification to HPD, stating that all violations in Plaintiff's apartment had been corrected, the New York City Housing Court relied upon HPD's records showing "no open violations" and accordingly dismissed Plaintiff's enforcement proceeding. The Housing Court judge expressly stated that he was required to defer to HPD's records, which had been falsified by Defendants, depriving Plaintiff of judicial relief to correct unsafe and unremediated conditions

46. Due to the improper closure of Plaintiff's HP case based on Defendants' false certifications, Plaintiff was compelled to file a new complaint with HPD in August 2025. (Exhibit E – *311 Complaints dated July 29, 2025*).
47. HPD's inspection in August 2025 confirmed that the mouse infestation and self-closing door violations had not been fully remediated, validating Plaintiff's claims that Defendants' prior certifications were false.
48. On September 16, 2025, Defendants cured the self-closing door violation. However, Defendants then submitted yet another false certification to HPD claiming the mouse infestation had also been cured.
49. On October 23, 2025, following Plaintiff's tenant challenge and request for re-inspection, HPD confirmed that the mouse infestation remained unremediated. The inspection also revealed additional violations including chipped paint and discolored walls that Defendants had been ordered to address in April 2025 but never completed. (Exhibit C – *HPD Violations Notice*)
50. This pattern of false certifications followed by re-inspections confirming continued violations demonstrates Defendants' systematic fraud on government oversight mechanisms.
51. Despite Plaintiff's repeated efforts to obtain relief in Housing Court through motions and applications, the court denied these requests based on HPD's representations that no violations existed. (Ex. O, Ex. P). These denials were the direct result of Defendants' fraudulent certifications to HPD, which created false official records that the Housing Court relied upon. Plaintiff has appealed these decisions and filed an Article 78 proceeding against HPD, but continues to suffer harm from the unremediated conditions and the ongoing threat of eviction based on the fraudulent dismissal of her repair case.

## Unauthorized Photography and Privacy Invasion

52. Upon belief, Defendant Alex Smaljaj took unauthorized photographs of the interior of Plaintiff's apartment during service visits without her knowledge or consent sometime in April to June of 2025. (Exhibit I – *Unauthorized Photograph*)
53. Defendants provided these unauthorized photographs to their attorneys, who then transmitted them through NYSCEF, making private images of Plaintiff's home part of the public court record.
54. This photography and transmission was done without court authorization and violated Plaintiff's reasonable expectation of privacy in her home.
55. During the May 15, 2025 housing proceeding, one of the Defendant's attorneys from the Azoulay Weiss firm took Plaintiff into the hallway and repeatedly asked whether she had seen the online submission containing the unauthorized photograph.

## Financial Retaliation and Credit Reporting Fraud

56. On April 3, 2025, during a court proceeding, Defendants' attorney questioned Plaintiff about her financial solvency and pending federal contract.
57. Within 24 hours, on April 4, 2025, Plaintiff received an alert that Defendants had falsely reported her as "evicted" to Topline Management, a credit reporting agency. (Exhibit K – *False Credit Reporting*)
58. This "eviction" status was impossible since no judge had made any eviction ruling, and Plaintiff's case was still pending. (Exhibit K)

59. The timing demonstrates coordinated retaliation designed to damage Plaintiff's creditworthiness and federal employment prospects immediately after learning about her pending federal contract.

### Systematic Discrimination and Harassment

60. On May 15, 2025, Plaintiff documented a pattern of racially biased treatment by maintenance staff, specifically noting differential treatment between Black and Hispanic inspectors and requesting removal of Juan Mitre due to safety and discrimination concerns. (Exhibit N – *Email about Pest Remediation Specialist's Behavior*)
61. Despite formal notice of discrimination concerns, Defendants continued to send the same problematic inspector and failed to address the documented pattern of discriminatory treatment.
62. On May 25, 2025, Plaintiff, during a pest remediation service, Plaintiff questioned Defendant Juan Mitre about a report he submitted where he noted that her apartment was dirty, and that she was "unavailable to sign" but also that she was "available to provide access and sign the m.p.c. sheet. Prior ro May 25, 2025, Plaintiff had never declined to sign. When questioned, Defendant denied knowing anything about the report, stating, "I'm not too sure it could have been a misunderstanding." Attorneys for 605 West 42nd ST LLC submitted this report to the court. (Exhibit N – *Report from Juan Mitre*)
63. Through May and June 2025, Defendant Mitre also visited Plaintiff's apartment, and repeatedly stated that he did not perform Integrated Pest Management services. In October 2025, however, after the third violation, Defendant Mitre arrived at Plaintiff's apartment and performed Integrated Pest Management services in the kitchen.
64. Defendants coordinated with each other and Azoulay Weiss attorneys in a systematic campaign to obstruct Plaintiff's disability accommodations, prevent proper remediation, and retaliate against her for asserting fair housing rights.

### Ongoing Harm and Continued Violations

65. As of the filing of this complaint, proper remediation using Integrated Pest Management has not been completed, causing Plaintiff ongoing exposure to allergens that exacerbate her documented disabilities.
66. Plaintiff continues to require medication to address health impacts to her hearing and respiratory system caused by Defendants' failure to provide reasonable accommodations.
67. Defendants' conduct demonstrates a calculated decision to prioritize their $459 million bond financing arrangement over Plaintiff's health, safety, and federal civil rights.

---

## CAUSES OF ACTION

### Count I - Violation of Fair Housing Act (42 U.S.C. § 3604(f))

46. Plaintiff incorporates by reference all preceding allegations.
47. Plaintiff is a person with a disability as defined by the Fair Housing Act.
48. Defendants denied Plaintiff reasonable accommodations for her disabilities by refusing to provide proper pest remediation and air quality improvements despite clear notice of her disability-related needs.

49. Defendants' systematic obstruction of court-ordered remediation and false reporting to regulatory agencies constituted discrimination based on disability in violation of 42 U.S.C. § 3604(f).

## Count II - Retaliation Under Fair Housing Act (42 U.S.C. § 3617)

50. Plaintiff incorporates by reference all preceding allegations.
51. Plaintiff engaged in protected activity under the Fair Housing Act by requesting disability accommodations, filing a legal proceeding to obtain official documentation of repairs needed in her apartment, asserting habitability issues as a defense in the nonpayment proceeding LT-300670-25/NY Defendant initiated against her, and reporting discriminatory treatment.
52. In response to Plaintiff's protected activities, Defendants engaged in a coordinated campaign of retaliation designed to intimidate, coerce, and punish Plaintiff, including: false affidavits, fasely reporting her as “evicted” to a credit reporting agency, taking an unauthorized photograph of her apartment and transmitting them through NYSCEF to make private images of the Plaintiff’s home public record, refusing to remediate as required by municipal laws causing Plaintiff to repeatedly have to submit complaints to HPD. This conduct was designed to discourage Platintiff from continuing to asser her fair housing rights, and to intimidate and humiliate the Plaintiff.
53. With respect to the unauthorized photography, Defendants’ attorney, Azoulay Weiss Firm, did not properly serve the defendant, so she would not have found out about the unauthorized photograph had she not taken initiative to independently sign up for NYSCEF. (Exhibit J – *Notice of Appearance filed by Attorney*)
54. Defendants also employed the same attorney in both HP-000203-25/NY (repair case) and LT-300670-25/NY (nonpayment case). This attorney coordinated a retaliatory legal strategy that:
    - Used false certifications to obtain dismissal of Plaintiff's HP case
    - Strategically deployed that fraudulent dismissal to undermine Plaintiff's habitability defense in the nonpayment proceeding
    - Uploaded the unauthorized photographs of Plaintiff’s apartment taken by landlord’s agent Defendant Smaljaj through NYSCEF to make private images of Plaintiff's home public record, causing humiliation and invasion of privacy
    - Threatened Plaintiff with eviction as punishment for asserting her disability rights
    - Systematically eliminated her ability to document and prove ongoing violations
55. This cross-proceeding coordination demonstrates that Defendants' retaliatory conduct was not isolated incidents, but rather a comprehensive, calculated campaign executed through multiple legal and administrative channels simultaneously.
56. Moreover, despite repeated court orders and Plaintiff's clear documentation of disability-related needs, Defendants systematically refused to provide proper Integrated Pest Management remediation required by Local Law 55.
57. After Plaintiff formally documented a pattern of racially biased treatment by maintenance staff on May 15, 2025, and specifically requested removal of Juan Mitre due to safety and discrimination concerns, Defendants deliberately continued to send the same problematic inspector.
58. This continuation was retaliatory and designed to create a hostile, intimidating environment.
59. The timing of Defendants' retaliatory acts demonstrates clear cause-and-effect:

| Date | Plaintiff's Protected Activity | Defendants' Retaliatory Response |
|---|---|---|
| Jan 30, 2025 | Disclosed disability and requested accommodation | Continued denial of proper remediation |
| Feb 3, 2025 | Filed HP proceeding | Coordinated impromptu inspection to circumvent court order (Feb 12) |
| Feb 9, 2025 | Reiterated disability needs and specific accommodation requests | Systematic obstruction continued |
| Apr 3, 2025 | Attorney learned of federal contract during court | False "eviction" credit report filed within 24 hours (Apr 4) |
| Apr 17, 2025 into May 2025 | Explicitly stated "I was diagnosed with asthma, so Local Law 55 applies" | False affidavit filed (dated May 13) claiming full compliance |
| May 2025 | Continued asserting rights in court, including a request for sanctions upon discovering false affidavits and failure to remediate | False affidavit filed (dated May 24) claiming full compliance |
| May 15, 2025 | Documented racial discrimination concerns | Continued sending same problematic inspector |
| June 2025 | Request that unauthorized photograph of Plaintiff’s apartment be removed from NYSCEF | Defendant’s attorney filed counter motion against Plaintiff; Second false affidavit unauthorized photos made public; |
| June 2025 - Present | Requests for Integrated Pest Management Practices | Systematic obstruction continued |

60. The timing and escalating nature of Defendants' retaliatory conduct demonstrates unlawful retaliation under 42 U.S.C. § 3617.
61. Defendants' conduct is designed to have a chilling effect not only on Plaintiff but on all tenants who might consider asserting their fair housing rights, sending a message that:
    - Requesting disability accommodations will result in false accusations
    - Filing legal proceedings will trigger credit sabotage
    - Asserting rights will lead to privacy invasion
    - Documenting violations will be met with coordinated legal attacks across multiple forums

## Count III- RICO Violation (18 U.S.C. § 1961 et seq.)

58. Plaintiff incorporates by reference all preceding allegations.
59. Upon information and belief, Defendants participated in an enterprise engaged in interstate commerce, consisting of the owner, managing agents, and affiliated contractors, which repeatedly submitted false certifications to HPD and related agencies via electronic transmission and mail, in order to obtain and retain tax benefits under the 421-a program. Such acts constitute a pattern of racketeering activity under 18 U.S.C. §§ 1341, 1343, and 1961 et seq., causing Plaintiff to suffer financial losses from overpayment of rent for an unremediated unit.
60. Upon belief, wire fraud predicate acts include:
    - Transmitting false affidavits through court electronic filing systems around June 24, 2025
    - At least two electronic submission of false HPD certifications claiming completed remediation prior to July 29, 2025 and around October 15, 2025.

- o Coordinated electronic communications with HPD officials to circumvent inspection requirements

61. Upon belief, mail fraud predicate acts include:
    - o Mailing false certifications to HPD claiming remediation compliance
    - o Submitting false lease agreements omitting required disability and safety notices
    - o Using mail system to coordinate the fraudulent scheme with government officials
62. Enterprise coordination evidence includes:
    - o Defendant Alex Smaljaj appearing at Plaintiff's apartment with HPD Inspector Courtney Posley on February 12, 2025, in coordination to subvert the February 17, 2025 court-ordered inspection
    - o HPD's acceptance of Defendants' false certifications without conducting required reinspections, contrary to HPD's own policies, Chapter 16, § 385(b) of the New York City Charter requiring agency heads to "exercise due diligence in ensuring the faithful execution, enforcement and performance" of their duties and NYC Administrative Code § 27-2115(f)(7) requiring reinspection after tenant notice.
    - o Systematic alteration of complaint records and premature closure of violations in coordination with Defendants' false reporting
    - o Cross-proceeding legal coordination whereby the same attorneys represent defendants in both HP-000203-25/NY (habitability/repair proceeding) and LT-300670-25/NY (nonpayment proceeding), and engage in lying, failure to serve Plaintiff properly, and fraudulently undermine Plaintiff in the HP case to gain advantage in the other proceeding.
63. The pattern of racketeering activity was conducted with the common purpose of concealing habitability violations to protect Defendants' $459 million bond financing, avoiding disclosure requirements for material litigation in bond offering documents, systematically depriving Plaintiff of disability accommodations and obtain an eviction judgment against Plaintiff to eliminate her claims and retaliate for her assertion of fair housing rights
64. As a direct result of this racketeering activity, Plaintiff has suffered injury to her health, property, civil rights and targeting of her property interest in her leasehold tenancy through coordinated fraud across multiple legal proceedings.
65. The fraudulent scheme had a specific property goal: using false certifications to dismiss Plaintiff's HP case (HP-000203-25/NY), then deploying that fraudulent dismissal in the concurrent nonpayment proceeding (LT-300670-25/NY) to defeat Plaintiff's habitability defense and obtain an eviction judgment.
66. On or about July 29, 2025 the Housing Court judge dismissed or limited Plaintiff's HP case, expressly stating that he was required to defer to HPD's records showing "no open violations"—records that had been falsified by Defendants' false certifications.
67. This cross-proceeding coordination demonstrates a unified fraudulent scheme designed to deprive Plaintiff of her property interest in her tenancy.

## Count IV - Rehabilitation Act Violation (29 U.S.C. § 794)

68. Plaintiff incorporates by reference all preceding allegations.
73. The subject property receives federal financial assistance through housing programs, tax benefits, and 80/20 program funding mechanisms that involve federal oversight.
74. Defendants, as recipients of federal financial assistance totaling hundreds of millions of dollars through bond financing and tax benefit programs, discriminated against Plaintiff based on her disability in violation of Section 504 of the Rehabilitation Act.

75. This discrimination included systematically denying reasonable accommodations and coordinating with government officials to obstruct disability-related remediation requirements.

## Count V - Fair Credit Reporting Act Violation (15 U.S.C. § 1681)

76. Plaintiff incorporates by reference all preceding allegations.
77. Defendants are sophisticated participants in consumer financial services, having partnered with Bilt Rewards and Mastercard to offer credit-based rewards programs to their residents, demonstrating extensive knowledge of credit reporting systems and accuracy requirements. (Exhibit Q – *Bilt Rewards Partnership*)
78. On April 4, 2025, Defendants furnished false information to Topline Management, a credit reporting agency, by falsely categorizing Plaintiff's status as "evicted" when no court had made any eviction ruling.
79. This false information was reported to credit bureaus and adversely affected Plaintiff's credit score and creditworthiness.
80. Defendants' false reporting violated their duties under the Fair Credit Reporting Act to provide accurate information to credit reporting agencies.
81. Defendants acted willfully in reporting false information, as evidenced by:
    - The impossible nature of "evicted" status when the case was still pending
    - Their sophisticated knowledge of credit systems through their Bilt Rewards partnership
    - The strategic timing immediately after questioning Plaintiff about her financial solvency and federal contract
82. As a direct result of Defendants' FCRA violations, Plaintiff suffered damages including credit score reduction, reputational harm, potential impact on federal employment prospects, and the time and expense required to dispute the false information. (Exhibit M – *Additional Credit Disputes*)

## Count VI - Intentional Infliction of Emotional Distress

83. Plaintiff incorporates by reference all preceding allegations.
84. Defendants' conduct, including systematic denial of disability accommodations, false credit reporting, privacy violations, and coordination with attorneys to obstruct court orders, was extreme and outrageous.
85. Defendants knew or should have known that their conduct would cause severe emotional distress, particularly given Plaintiff's disability status and ongoing health crisis.
86. As a direct result, Plaintiff suffered severe emotional distress, anxiety, mental anguish, hospitalization, and exacerbation of her medical conditions.

---

# DAMAGES

87. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered injury to her property interests and economic interests, including:

    a) **Jeopardy to Leasehold Property Interest**: The fraudulent scheme placed Plaintiff's leasehold tenancy in jeopardy through the nonpayment proceeding, threatening her with eviction and loss of her home;

b) **Inability to Assert Lawful Defense**: The fraudulent dismissal of her HP case deprived Plaintiff of her ability to assert her lawful habitability defense in the nonpayment proceeding;

c) **Exposure to Wrongful Eviction**: Plaintiff faces exposure to an eviction judgment based on the fraudulent dismissal of her repair case, which would result in loss of her home, damage to her rental history, and difficulty obtaining future housing;

d) **Loss of Use Value**: Plaintiff lost the use value of the habitable apartment she was entitled to under her lease and under law, while being threatened with eviction for withholding rent on an uninhabitable unit;

e) **Continued Financial Liability**: Plaintiff faces continued financial liability for rent on an uninhabitable unit due to Defendants' fraudulent concealment of violations;

f) **Medical Expenses**: Plaintiff incurred medical expenses including hospitalization on April 24, 2025, and ongoing treatment costs directly resulting from Defendants' failure to remediate conditions they fraudulently certified as corrected;

g) **Credit Damage**: Defendants' false reporting to credit agencies as part of the coordinated scheme damaged Plaintiff's creditworthiness and ability to secure alternative housing or employment;

h) **Lost Economic & Professional Opportunities** : Plaintiff lost economic opportunities, including potential impacts on federal employment prospects, due to the false eviction reporting and ongoing legal jeopardy. Plaintiff also has a career as a professional singer, voice-over artist, and performing artist which depends on optimal respiratory function and hearing acuity. The permanent respiratory and auditory conditions caused by Defendants' systematic negligence have directly impacted Plaintiff's professional capabilities.

i) **Cost of Legal Defense**: Plaintiff incurred costs defending against the nonpayment proceeding that was predicated on the fraudulent dismissal of her HP case.

j) Constitutional injury from systematic denial of civil rights

k) Continued disability discrimination and denial of reasonable accommodations

l) Privacy violation harm from unauthorized photography and transmission

m) Retaliation harm from coordinated campaign of harassment and intimidation

88. Defendants' conduct has been willful, wanton, and showed conscious disregard for federal civil rights laws, warranting substantial punitive damages.
89. Defendants' conduct is not limited to Plaintiff. Multiple tenants across. Defendants' building portfolio have filed lawsuits alleging similar patterns of habitability violations, safety failures, and systematic misconduct. In at least one case, a tenant has valued their claims at $100,000,000.
90. The existence of multiple lawsuits demonstrates that Defendants' conduct represents a systematic business practice rather than isolated incidents, and that previous legal

consequences have been insufficient to deter their continued violations of tenant rights. Substantial damages are necessary to create meaningful deterrence across Defendants' $10+ billion real estate portfolio and protect the thousands of vulnerable tenants in their buildings.

91. A detailed Statement on Damages explaining the necessity and proportionality of substantial damages in this case is set forth in the *Prayer for Relief* below.

---

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a) **Declare that Defendants engaged in systematic civil rights violations** under the Fair Housing Act, Rehabilitation Act, and constitutional law through coordinated denial of disability accommodations and retaliation;

b) **Find that Defendants' conduct demonstrates a pattern of targeting vulnerable disabled tenants** who lack resources to effectively challenge systematic violations of federal civil rights laws;

c) **Enjoin Defendants from further:**

- Denying reasonable accommodations for disability-related needs
- Retaliating against tenants who assert fair housing rights
- Making false statements to courts and regulatory agencies
- Invading tenant privacy through unauthorized photography
- Filing false credit reports or other forms of financial retaliation;

d) **Order Defendants to implement comprehensive compliance policies** including:

- Mandatory training on fair housing and disability accommodation requirements
- Supervision protocols for handling requests from tenants with disabilities
- Documentation requirements to prevent false certifications and statements;

e) **Award compensatory damages in an amount sufficient to fully remedy** the civil rights violations, privacy invasion, emotional distress, ongoing medical harm, and economic losses suffered by Plaintiff, including but not limited to $50,000,000;

f) **Award punitive damages in an amount sufficient to:**

- **Deter systematic discrimination against disabled tenants** by landlords who manage multi-billion dollar real estate portfolios
- **Send a clear message** that federal civil rights laws cannot be violated to protect financial interests, regardless of the amounts involved
- **Provide market-level deterrence** proportionate to Defendants' $10+ billion real estate portfolio, recent $630+ million international bond transactions, and the $459 million financing arrangement they prioritized over Plaintiff's civil rights
- **Reflect the egregious nature** of choosing systematic civil rights violations, and government corruption,

- **Eliminate the economic incentive** for billion-dollar real estate empires to weaponize government agencies against disabled tenants
- Including but not limited to $450,000,000;

g) **Award reasonable attorneys' fees and costs** pursuant to 42 U.S.C. § 3613(c)(2), 42 U.S.C. § 1988, and other applicable fee-shifting statutes;

h) **Grant any other relief** the Court deems just and proper to protect the rights of disabled tenants and ensure that federal civil rights laws provide meaningful protection against systematic discrimination.

---

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

I, Aida R. Gil, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1. I am the Plaintiff in this action and have personal knowledge of the facts stated in this Amended Complaint;
2. The allegations in this Amended Complaint are true and correct to the best of my knowledge, information, and belief;
3. The exhibits attached hereto are true and accurate copies of the documents they purport to be;
4. I understand that false statements made in this verification are punishable as perjury.

Executed on _November 10_, 2025.



**Aida R. Gil**
*Plaintiff, Pro Se*
ARG383@GMAIL

## EXHIBIT LIST

***MEDICAL AND DISABILITY DOCUMENTATION***

**Exhibit A - Medical Records and Diagnoses**

- December 2023: Asthmatic Allergic Rhinitis diagnosis
- February 2025: Eustachian Tube Dysfunction (ETD) diagnosis
- Prescription records (Trelegy Ellipta, Symbicort)
- April 24, 2025: Hospitalization records

***DISABILITY DISCLOSURE AND ACCOMMODATION REQUESTS***

**Exhibit B** - Disability Disclosure Communications

- January 30, 2025: Email stating "I am allergic to mice, I have been experiencing respiratory issues" and February 9, 2025: Email stating "I suffer from allergic rhinitis and asthma and am allergic to mice"
- April 17, 2025: Email stating "I was diagnosed with asthma, so Local Law 55 applies"

***HPD VIOLATIONS AND FALSE CERTIFICATIONS***

**Exhibit C - HPD Violation Summaries and Inspection Records**

- March 4, 2025: Open Violation Summary (Class B and C violations)
- April 3, 2025: Court Order based on Open violations
- May 15, 2025: Court Order (confirming violations still exist, contradicting Del Orbe's May 13 affidavit)
- August 2025: Snapshot of Open Violations in plaintiff's apartment on HPD's website
- November 2025: Snapshot of Open Violations in plaintiff's apartment on HPD's website

**Exhibit D - HPD Inspector Records**

- February 12, 2025: Documentation of impromptu inspection by HPD Inspector Courtney Posley
- Email sent to management shortly after appearance of Defendant Alex Smaljaj (then unknown to Plaintiff) and the HPD inspector

**Exhibit E** - 311 Complaints

- July 29, 2025 complaint
- October 26, 2025 complaint

***GOVERNMENT CORRUPTION AND ARTICLE 78***

**Exhibit F** - Community Board Documentation

- Community Board letter documenting HPD's failure to properly advertise affordable housing units in Defendants' building
- Community Board letter about the building's financing

**Exhibit G** - Article 78 Proceeding Against HPD

- Index No. 100618/2025, Gil v. NYC Dept. of Housing Preservation & Development, Filed June 17, 2025 and Amended August 26, 2025 in the New York Supreme Court before Hon. David B. Cohen: Petition (Selections are provided because many of the supporting documents are already exhibits)

***DEFENDANTS' FALSE STATEMENTS AND RETALIATION***

**Exhibit H** - Julio Del Orbe False Affidavits

- May 13, 2025: First false affidavit claiming violations cured
- May 24, 2025: Second false affidavit escalating false statements

**Exhibit I** - Unauthorized Photographs and Privacy Invasion

- Photographs of Plaintiff's apartment interior filed via NYSCEF
- October 2025: Plaintiff's email to management regarding unauthorized photography

**Exhibit J** - Notice of Appearance and Service Issues

- Attorney's Notice of Appearance that was never served on Plaintiff
- Affirmation of Service filed in court but Plaintiff never received mailing

***FALSE CREDIT REPORTING AND FINANCIAL RETALIATION***

**Exhibit K** - False Credit Reporting Documentation
- April 4, 2025: Credit alert showing false "evicted" status (24-hour turnaround after April 3 court proceeding)
- Plaintiff's credit dispute filed April 4, 2025

**Exhibit L** - Credit Reporting Agency Documentation
- Correspondence with Topline Reporting credit reporting agency and the first page of the Rent Ledge they provided, were Plaintiff's status is "Eviction" – a primary reason Topline felt justified in initially refusing and then delaying to make requested correction to Plaintiff's credit report

**Exhibit M** - Additional Credit Disputes
- Complaints filed with state and federal agencies, whereby Plaintiff learned that Topline was not an accredited agency

***PATTERN OF DISCRIMINATION AND HARASSMENT***

**Exhibit N** - Pest Remediation Specialist Conduct
- Email documenting Juan Mitre's behavior and racial bias concerns from May 15, 2025
- Juan Mitre's Report about my apartment,
- Other Specialist's Report for contrast, where there is no mention of my apartment being dirty

***COURT PROCEEDINGS - CROSS-CASE COORDINATION***

**Exhibit O** - Court Dockets and Filings
- HP-000203-25/NY (Repair/habitability case) –
  - March 5, 2025: Stipulation agreement
  - April 3, 2025: Court orders
  - Court Order/Denial, Document 24
  - Court Order/Denial, Document 33
  - Court Order/Denial, Document 47
  - Court Order/Denial, Document 48
  - Notice of Appeal, Document 58

**Exhibit P**- Court Dockets and Filings
- LT-300670-25/NY (Nonpayment/eviction case) - selections docket
  - June 3, 3035, Court/Order/Denial 2, where Judge Frances Ortiz refers to Plaintiff's motion as a "self-serving rant"
  - September 9, 2025, Court Order/Denial 43
  - September 10, 2025, Plaintiff's Amended Order to Show Cause, Document 44
  - September 26, 2025, Court Order/Denial, 66

***DEFENDANTS' FINANCIAL SOPHISTICATION***

**Exhibit Q** - Bilt Rewards Partnership Documentation
- Evidence of Defendants' partnership with Bilt Rewards and Mastercard
- Financing Agreement